WHIPPLE, J.,
dissenting.
Pursuant to Boyd v. Allied Signal, Inc., 03-1840 (La.App. 1st Cir.12/30/04), 898 So.2d 450, writ denied, 05-0191 (La.4/1/05), 897 So.2d 606, appellate review of a trial court’s decision to certify a class action involves a two-part analysis, to-wit: the trial court’s factual findings in the first step of certification are subject to review under the manifest error standard and the trial court’s ultimate decision regarding certification is then reviewed under the abuse of discretion standard. Moreover, in reviewing such certification, appellate courts are cautioned that the proof necessary to satisfy the criteria for certification need not be by a preponderance of the evidence, but only requires a prima facie showing. Boyd, 03-1840 at pp. 10-11, 898 So.2d at 457. Despite these precepts and the extensive explanation provided by the trial court in support of its decision, which shows the trial court performed the multifaceted analysis set forth in Boyd, the majority finds that the trial court incorrectly certified the subclasses herein and rejects the trial court’s findings accordingly. In my view, the majority erred in doing so.
In the instant case, plaintiffs presented, and the trial court relied upon, inter alia, the “Forensic Meteorology Report” issued by Dr. David Mitchell, with MET Associates, an expert in forensic meteorology. In the report, relied upon |aextensively by the majority herein, Dr. Mitchell directly challenged the ultimate opinion rendered by Dr. Paolo Zannetti, a defense expert, explaining and concluding as follows:
The atmospheric dispersion modeling results presented in this report (both CALPUFF and AERMOD) show nonzero ground level concentrations of sulfuric acid (H2S04) occurring beyond the fence line of the Rhodia, Inc. Plant as a result of the upset release of S03 which occurred on February 22,1999. However, these models do not account for the presence of wind turbulence and variations in the wind speed magnitude and the wind speed direction which can occur during intervals of time less than 1 hour in duration. When model outputs of the calculated H2S04 concentration level contours are plotted on top of the area map of the region downwind of the release, the *497 modeling results show that large areas of Baton Rouge, Louisiana were exposed to and impacted by S03 emissions and the resulting H2S04 vapors carried downwind of the emitting source. [Emphasis added].
After identifying the air modeling simulation performed by Dr. Zannetti using the parameters as listed in the attached Tables 1 and 2, Dr. Mitchell noted that Dr. Zannetti’s opinion was based on his use of a “puff’ model to run his model simulation, which calculated “a maximum sulfuric acid (H2S04) ground level concentration of 322 micrograms per cubic meter for a 30 minute exposure” with “[gjround level sulfuric acid concentration contours of 10, 20 and 200 micrograms per cubic meter [as] displayed on the figure.” In challenging Dr. Zannetti’s opinion, Dr. Mitchell then observed: “Note that the concentration contours follow the hourly wind pattern for the morning hours of February 22, 1999.” However, “[t]he air dispersion models do not account for any instantaneous changes in wind speed magnitude and wind speed direction which would occur during the hourly averaging period.” While the majority focuses on the portion of Dr. Mitchell’s report, which included an analysis and discussion of a downwind air dispersion model run (using an elevated stack source and recorded on a uniform grid of ground level receptors located downwind of the source), the trial court focused on Rand accepted Dr. Mitchell’s opinion that the models relied upon by the defense did not account for changes in the hourly wind speed, direction and magnitude which would occur during the period in question. (Moreover, in my view, Rhodia’s own internal documents, produced in response to plaintiffs request for production of documents call Dr. Zannetti’s assumptions regarding wind speed and direction into question, given that Rhodia was unable to directly verify the data given to its attorneys and expert regarding wind speed, as reflected in the response document marked “CONFIDENTIAL” dated 11/12/1999, which notes its missing critical logs. Further, to the extent that the majority credits and relies upon Dr. Francis Weir’s opinion, as the majority recognizes, his conclusions likewise are only valid “if the facts are as they have been presented” by Rhodia’s expert “regarding the source of the release and the wind direction.”
Thus, considering the various exhibits introduced at the hearing on class certification, along with Dr. Mitchell’s report and opinions, I find the plaintiffs met their burden of making the requisite evidentiary showing to establish a prima facie case to support the certification of the particular classes as carefully drawn by the trial judge. As the record demonstrates, the trial court carefully considered all of the documents and evidence submitted in support of and opposition to the motion for class certification and rendered an opinion based on its factual findings for which there is ample support in the record. Thus, in my view, the majority errs in substituting its | ¿opinion for that of the trial court, given the record before us.[1]
*498 In sum, considering the applicable law as set forth in Boyd and related cases, and given the record as a whole, I would affirm the trial court’s judgment at defendant’s costs. As observed by the trial court, when discussing Boyd, “if there is an error to be made, it should be made in favor of, and not against the maintenance of the class action,” inasmuch as the certification of class action is always subject to modification should later developments, during the course of the trial, so require.” As the cases recognize, class action certification is purely procedural and the review of such a decision should not be premised on the ultimate likelihood of success (or lack thereof) on the merits. Moreover, the substitution on appeal of one expert’s testimony over that of another is not properly part of the scope of appellate review of the certification process. For these reasons, I respectfully dissent.

. I also disagree with the majority's finding that the trial court’s ruling was premised on the court taking improper judicial notice of the judge’s experience of wind patterns experienced while sitting in a Baton Rouge stadium. Considering the judge's comments in the context of the court's overall remarks explaining why the court tended to agree with Dr. Mitchell's opinion, I find the majority unfairly characterizes the basis of the trial court’s ultimate conclusion. As the above quoted excerpts show, Dr. Mitchell's report, while plotting the areas in more detail on an area map downwind of the release, nonetheless specifically states that his modeling results showed that "large areas of Baton Rouge, Louisiana” were impacted.