997 So.2d 111 (2008)
Terry BOYD, April Lejeune, Christy Lejeune, Paul James, Linda Barrett, Joyce Snearl, Andrea Lafeyette, Daniel Anvello, Jeanette McRight, Dalton McRight, Paula Bourgeois, and All other Similarly Situated Persons
v.
ALLIED SIGNAL, INC.
No. 2007 CA 1409.
Court of Appeal of Louisiana, First Circuit.
October 17, 2008.
*113 Lewis O. Unglesby, Denise A. Vinet, Donna U. Grodner, Ralph Fletcher, Baton Rouge, Louisiana, for Plaintiffs/Appellees, Terry Boyd and all other similarly situated persons.
Kathleen F. Drew, Mark C. Surprenant, Jeffrey E. Richardson, New Orleans, Louisiana, John E. Heinrich, Baton Rouge, *114 Louisiana, Jerald L. Album, Metairie, Louisiana, for Defendants/Appellants, Allied Signal, Inc.
Before GAIDRY, McDONALD, and McCLENDON, JJ.
GAIDRY, J.
The defendants in a class action based upon a chemical release appeal a judgment award in favor of one of the class representatives. For the following reasons, we reverse the judgment in favor of that class representative.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
The facts forming the basis of the cause of action at issue were described in detail in our earlier decision in Boyd v. Allied Signal, Inc., 03-1840, pp. 5-6 (La.App. 1st Cir.12/30/04), 898 So.2d 450, 453-54, writ denied, 05-0191 (La.4/1/05), 897 So.2d 606. To briefly summarize, on August 2, 1999, a compressed gas trailer owned by Allied-Signal, Inc. (now Honeywell International, Inc.) and loaded with boron trifluoride (BF3) developed a leak from one of its tubes while being transported as a tractor-trailer unit. After the leak was discovered, the tractor-trailer unit stopped around noon on the westbound shoulder of Interstate Highway 12 (1-12) on or near its overpass for Cedarcrest Avenue in Baton Rouge, where the tube continued to leak and dispersed BF3 in the air. Mitigation efforts ensued, and were completed approximately eighteen hours later.
The plaintiff herein, Janet Ayo Smith, entered the westbound portion of Interstate Highway 12 from the Millerville Road entrance ramp, and about five to ten minutes later encountered stalled traffic and observed a police officer some distance ahead, standing outside his unit. She estimated that she stopped her vehicle due to the stalled traffic sometime between 12:30 p.m. and 1:00 p.m. After pulling her vehicle onto the shoulder, she and her husband exited the vehicle and walked to the side of the highway, where she observed a truck ahead, surrounded by a haze. Ms. Smith claimed that she was about twelve vehicles behind the truck. She and her husband were out of their vehicle for about five to ten minutes, and were stopped in traffic a total of twenty to thirty minutes before exiting 1-12 on the Sherwood Forest Boulevard exit ramp. She and her family then proceeded to a friend's apartment located in the Forestwood Apartments complex near the end of Mead Road, where they stayed for the next two to three hours and saw television coverage of the incident. Ms. Smith claimed that she experienced eye irritation and coughing during the course of events, and washed her eyes with eyewash after arriving at her friend's residence. She did not seek medical treatment for those claimed symptoms.
A number of civil actions seeking class action status were subsequently filed. The trial court consolidated the various actions and ultimately certified a class action as to the issue of liability, establishing geographic boundaries approximately corresponding to those of an emergency "shelter in place" plan for nearby residents and to various gas dispersion plumes or isopleths estimated on a successive hourly basis by the plaintiffs' expert in atmospheric dispersion. We affirmed the trial court's decision to certify the class action, but reversed the judgment as to one of the designated class representatives, who was conclusively shown not to have been a member of the defined class. Id., 03-1840 at pp. 25-7, 898 So.2d at 465-66. Ms. Smith was one of the remaining class representatives.
On June 9, 2006, the three remaining defendants (appellants herein) reached an *115 agreement with the class representatives whereby the defendants stipulated to their liability in favor of the class representatives, according to the defendants' confidential agreement apportioning their respective percentages of fault. The claims of the five class representatives were then tried in a consolidated trial on June 12, 13, 14, and 20, 2006, and July 19, 2006, the contested issues being limited to causation and damages. The defendants moved for an involuntary dismissal of Ms. Smith's cause of action at the conclusion of her presentation of evidence, but the trial court denied that motion. At the conclusion of the trial, the trial court issued its oral reasons for judgment in favor of the five class representatives, and its combined judgment on all five claims was signed on July 28, 2006. The plaintiff, Janet Ayo Smith, was awarded the sum of $300.00. Notice of judgment was mailed on August 1, 2006.
On August 9, 2006, the defendants filed a motion for new trial limited to the combined judgment's award of $2,500.00 in favor of one class representative, Michael Paul. No other motion was filed with regard to the awards to the other class representatives. The trial court heard the motion for new trial on October 2, 2006, and granted the motion. Its judgment vacating the original award to Mr. Paul and awarding him $750.00 on the new trial was signed on October 25, 2006. That judgment further provided that "all other aspects of the Court's July 28, 2006 judgment... are incorporated herein," and the court certified that judgment as final under La. C.C.P. art. 1915(B).
Following the rendition of the judgment granting the new trial, the defendants obtained an order for a devolutive appeal on December 6, 2006. On December 18, 2006, Ms. Smith's counsel executed a stipulation of satisfaction of judgment, based upon the defendants' payment of the judgment amount in favor of Ms. Smith, together with accrued legal interest.

ASSIGNMENTS OF ERROR
The defendants contend that the trial court erred in the following respects:
1. The trial court erred in denying a motion for involuntary dismissal of [Ms.] Smith's claims because she presented no proof that she was physically located within the geographic boundaries of the class and therefore no proof that she received a dose of boron trifluoride (BF3) sufficient to cause damages.
2. The trial court erred by granting a judgment for [Ms.] Smith because all evidence, including her own testimony and the testimony of her own expert witnesses, establishes that she did not receive a dose of BF3 sufficient to cause damages.

TIMELINESS OF APPEAL
In her brief, Ms. Smith challenges the timeliness of the appeal taken by the defendants. She contends that the first combined judgment of July 28, 2006 was a final judgment, unaffected by the filing of the motion for new trial related to the first judgment's award in favor of Mr. Paul, and that the defendants' failure to timely move for a new trial or appeal the first judgment as to her award warrants the dismissal of the defendants' present appeal, perfected on December 6, 2006. Because this issue is jurisdictional in nature, we will address it before examining the merits of the appeal.
Louisiana Code of Civil Procedure article 1971 provides:
A new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of the issues, or for reargument only. If a new *116 trial is granted as to less than all parties or issues, the judgment may be held in abeyance as to all parties and issues. (Emphasis supplied.)
In Thurman v. Star Electric Supply, Inc., 283 So.2d 212 (La.1973), the supreme court disagreed with this court's interpretation of the emphasized sentence to mean that when a new trial is granted as to one or less than all of the issues, the judgment will not be held in abeyance as to the other issues unless ordered by the trial court. While acknowledging that the emphasized sentence "would lead one to believe that a judgment would not be stayed unless the judge orders the stay when granting a new trial," the supreme court observed that the provision at issue "was designed to mesh with [La.] C.C.P. [art.] 1915," which authorizes appeals from some partial judgments. Id. at 216. It further noted that "[i]t would be a useless and technical trap if the rule were that, when a new trial is granted as to less than all the issues [as opposed to less than all the parties], the judgment becomes final as to all others." Id. at 216. It therefore held that "[i]n the absence of clear and compelling reasons," the entire judgment should be considered automatically held in abeyance as to all issues until all issues are resolved following the partial new trial. Id. at 217.
As to new trials granted to less than all of the parties, however, the supreme court in Thurman refused to adopt a similar rule. It rejected the proposition that La. C.C.P. arts.2087 and 2123, addressing devolutive and suspensive appeal delays, should be read to provide that a motion for new trial by any party serves to extend the appeal delays for all parties. Instead, it interpreted La. C.C.P. art.1971 as providing "for the finality of judgments in which some, but not all parties, file applications for new trials." In Simar v. Hartford Fire Ins. Co., 469 So.2d 4, 5 (La.App. 3rd Cir. 1985), the rationale of that holding in Thurman was explained:
In Thurman ... the Supreme Court concluded that a new trial application by one party does not necessarily extend another party's delay for appealing. However, where the issues are interrelated to the extent that one party's motion [for new-trial] and the trial court's action thereon substantially affect the nonmoving party or parties, the application for rehearing [sic] by one will extend the delay for taking an appeal for all parties.
Under that rationale, then, if the damages issues relating to Mr. Paul are unrelated to those for Ms. Smith, the motion for new trial on his judgment for damages should not operate to delay the appeal of her judgment for damages. Ms. Smith relies upon that rationale in contending that the present appeal is untimely, as the defendants timely moved for a new trial only as to Mr. Paul's award of damages. While we agree with Ms. Smith that the judgment of July 28, 2006 was a final, appealable judgment under La. C.C.P. art. 1915(A) and therefore did not require certification under La. C.C.P. art. 1915(B), we disagree with her ultimate proposition that the defendants' appeal is untimely.
According to Rosen v. State, through Dep't of Transp. & Dev., 01-0499 (La.App. 4th Cir.5/2/01), 785 So.2d 1049, the pertinent holding in Thurman no longer represents the rule in that regard. The court in Rosen held that an intervener's motion for new trial served to extend the defendant's delay for filing a suspensive appeal, based upon the addition of pertinent language to La. C.C.P. art. 2123. Id., 01-0499 at pp. 2-3, 785 So.2d at 1049. We agree. In that regard, we note that La. C.C.P. arts. 2087(C) (devolutive appeals) and 2123(B) (suspensive appeals) were both amended in 1987 to include the following:

*117 When one ... part[y] file[s] [a motion] for new trial ..., the delay periods [for appeal] shall commence for all parties at the time they commence for the [moving] party.
The foregoing language does not specifically require any connexity or overlapping issues between the multiple parties in order for the motion for new trial to suspend the appeal delays. Thus, for example, if Ms. Smith had sought to appeal her award in the combined judgment after the consolidated trial, she could seemingly have waited until after the motion for new trial as to Mr. Paul's award was decided. Logically, the defendants should be able to do the same thing under the strict wording of art. 2087(C), even though they did not move for a new trial as to Ms. Smith's award.
We also conclude that the defendants' satisfaction of the judgment in favor of Ms. Smith does not preclude their devolutive appeal of the judgment. Ms. Smith cites no authority for her position that the satisfaction of the judgment is inconsistent with the taking of a devolutive, rather than a suspensive, appeal.[1]
Considering the foregoing analysis, the jurisprudential policy favoring appeals, and the fact that Ms. Smith did not formally move to dismiss the appeal under Rule 2-8.1 of the Uniform Rules of Louisiana Courts of Appeal, we conclude that the better approach is to allow the defendants' appeal. See DiVincenti v. First Guar. Bank, 481 So.2d 712, 714 (La.App. 1st Cir.1985). We accordingly maintain the appeal.

STANDARDS OF REVIEW
An appellate court's review of factual findings in a civil appeal is governed by the manifest error-clearly wrong standard. In order to reverse a factual determination by the trier of fact, the appellate court must apply a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La. 1993). If the findings are reasonable in light of the record reviewed in its entirety, this court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
Louisiana Code of Civil Procedure article 1672(B) provides for a motion for involuntary dismissal of a plaintiffs action in the course of a bench trial:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
*118 The applicable standard to be used by a trial court to determine a motion for involuntary dismissal is whether the plaintiff has presented sufficient evidence to establish his case by a preponderance of the evidence. State Farm Mut. Auto. Ins. Co. v. Ford Motor Co., 04-1311, p. 5 (La.App. 1st Cir.6/15/05), 925 So.2d 1, 4. An appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong. Id.
In short, the manifest error standard of review is applicable to our consideration of both assignments of error herein.

DISCUSSION
That Ms. Smith was confirmed as a class representative based upon her putative status as a class member does not serve to conclusively establish that status or her entitlement to damages. As we pointed out in our earlier opinion affirming the certification of the class, "identification of members of the class based upon their claims of physical presence in its geographic and temporal limits is an issue separate from proof of the veracity of such claims." Boyd, 03-1840 at p. 27, 898 So.2d at 465-66. (Emphasis supplied.) We also observed that after certification, the veracity of class members' claims can properly be addressed "at some later stage of proceedings in the class action or the presentation of individual members' claims." Id., 03-1840 at p. 27, 898 So.2d at 466. (Emphasis supplied.) Thus, the legal issue of Ms. Smith's status as a class representative is distinct from the evidentiary issue of her actual physical presence within the geographic boundaries and time frame for the class. Ms. Smith was not thereby relieved of her burden of proof on the issues of causation and damages by virtue of her status as a class representative.
The tractor-trailer unit stopped on the westbound shoulder of 1-12 on or near its Cedarcrest Avenue overpass, and its position defined "ground zero" for purposes of defining the geographic boundaries of the class. I-12's westbound Sherwood Forest Boulevard exit is east of and well outside the geographic boundaries. Its westbound Airline Highway exit is west of the geographic boundaries, and "ground zero" is approximately equidistant between those exits. The geographic boundaries of the class were carefully drawn to coincide as closely as practicable with a circle defined by the quarter-mile "shelter-in-place" radius centered on "ground zero" and the BF3 dispersion plumes postulated by the plaintiffs' expert in air dispersion, Dr. Erno Sajo, in his air modeling. Dr. Sajo's trial testimony, presented by deposition, confirmed his earlier calculations relating to the maximum geographic extent of airborne BF3 concentration significant for toxicological purposes.
Ms. Smith testified that after she entered 1-12 from the Millerville Road entrance ramp, she travelled for "about maybe five or ten minutes" before encountering traffic that was "backed up." She and her husband discussed the possible reason for the stalled traffic, exited their vehicle, and "moved over a little bit to the side and looked and [saw] the truck." She claimed that her vehicle was then "about twelve cars behind it." A police officer was standing "about four cars ... in front of [her vehicle]," and Ms. Smith assumed that he was "instructing the people to exit off the Interstate." She remained "behind the truck" on 1-12 for twenty to thirty minutes, and was outside her vehicle for "five or ten minutes." Ms. Smith testified that she "got behind the truck" between 12:30 p.m. and 1:00 p.m.
Under cross-examination, Ms. Smith acknowledged her prior deposition testimony *119 that she remained in the right westbound lane after she entered 1-12. She confirmed that she used the Sherwood Forest Boulevard exit to leave 1-12 after stopping, and also admitted that she "might have" testified in her prior deposition that she was "six car lengths" from that exit when she decided to pull her vehicle over to the shoulder.[2] When asked whether there was anything that could have prevented her from using that exit to get off 1-12, Ms. Smith explained that "[e]verybody [other vehicles ahead of her] was pulled over to that side." She claimed that she could not recall testifying in her deposition that she could have used that exit to leave 1-12, rather than pulling to the shoulder, but did not deny that prior testimony upon being confronted with it.
Gary Smith, Ms. Smith's husband, testified that he was a passenger in the vehicle driven by his wife. He testified that they came upon stopped traffic on 1-12, and that after pulling onto the shoulder and stopping, they "found out ... that they had a leak or something going on." They exited their vehicle, but at some point they were told to get back in their vehicle. He claimed that the police directed them to exit 1-12, and that they exited the highway using the Airline Highway exit. Thus, according to Mr. Smith, they "probably" drove past the leaking tractor-trailer in order to access that exit, although he could not actually remember doing so. However, he also testified that he could not recall testifying in a prior deposition that they never drove past the leaking tractor-trailer. When asked if he saw that truck while stopped on 1-12, he claimed that he was not "paying attention." Upon being confronted with his deposition testimony that he saw the truck "turned over" and "laying [sic] sideways," he reluctantly acknowledged giving that testimony. Under direct questioning by the trial court, Mr. Smith claimed that his trial testimony about not observing the truck was accurate, but later, under cross-examination by the defendants' counsel, he chose to subscribe to his earlier deposition testimony.
The trial court expressly refused to credit any of Mr. Smith's testimony relating to the location of the Smith vehicle when it stopped on I-12 and the location of the exit used to leave 1-12. Its decision in that regard is not clearly wrong, as his testimony was plainly contradictory to and inconsistent with that of Ms. Smith, as well as his own pretrial deposition testimony. The clear preponderance of the evidence likewise establishes that Ms. Smith stopped her vehicle on 1-12 before its Sherwood Forest Boulevard exit, and did not pass that exit and turn around in order to use that exit to leave 1-12. Rather, the evidence compels the conclusion that she simply used that exit as the closest exit ahead of her. Thus, during the time she was on 1-12, she never approached the class geographic boundaries closer than the Sherwood Forest Boulevard exit. As for her testimony that she stopped her vehicle about twelve car lengths from the leaking tractor-trailer, such is plainly internally inconsistent with her acknowledgment that she could have been "six car lengths" from the Sherwood Forest Boulevard exit, and is further conclusively refuted by the maps depicting the respective locations of that exit and "ground zero."
At the conclusion of Ms. Smith's presentation of evidence, the defendants moved for involuntary dismissal of Ms. Smith's cause of action on the grounds that she failed to prove any symptomatic exposure to BF3. The defendants emphasized that the plaintiffs' own expert, Dr. Sajo, testified *120 that the Sherwood Forest exit was outside the area of his air modeling (upon which the class geographic boundaries were based), and that any concentration at that location "was so low that it would not have any significance from the point of view of a toxicologist." Additionally, the plaintiff's expert toxicologist, William Lowry, Ph.D., conceded that if a person claiming chemical exposure symptoms was outside the geographic range of a chemical release and outside the dispersion plumes shown on air modeling, he would not expect that person to have exposure or causation of symptoms. In its oral reasons for its ruling denying the defendants' motion, the trial court agreed that it was "quite apparent that Ms. Smith would not fit into the class as certified by the court" and was "apparently not a member of the class."[3] The evidence clearly supports the foregoing conclusion. The preponderance of the evidence shows that Ms. Smith never entered the geographic boundaries of the class during the relevant time period. However, the trial court expressed its understanding that Ms. Smith "got on the Interstate at [the] Millerville [Road entrance ramp]" and was "twelve cars behind the truck," and that "they [the Smiths] were driving twelve cars behind the truck that was leaking, certainly although not in the class action map."
In its oral reasons for judgment at the conclusion of trial, the trial court reiterated its conclusion that Ms. Smith "was not in any of the plumes," and that "if she suffered any exposure, it would be because of that exposure behind the truck on I[-]12." In the course of discussing Ms. Smith's claim, the trial court discussed the testimony of two other witnesses, Geri Sanders and Tonya Revere Cortez, who both affirmatively testified that they saw the tractor-trailer travelling on I-12 with the white fume of the leak. Referring to Ms. Sanders, the trial court remarked that "Geri Sanders testified, like Ms. Smith, [that] she was driving west from [the] Millerville [Road intersection] on I[-]12 when she saw the white smoke coming from the tank truck." (Emphasis supplied.) On that basis, the trial court awarded Ms. Smith $350.00 in general damages.
The trial court clearly erred in finding that Ms. Smith sustained symptomatic BF3 exposure while traveling on I-12 before stopping near the Sherwood Forest Boulevard exit. There was no testimony or other evidence supporting that finding. Significantly, Ms. Smith never testified that she was driving behind the tractor-trailer as it was traveling on I-12 before it stopped. It is readily apparent, given the voluminous nature of evidence presented at trial, that the trial court understandably confused the testimony of Ms. Smith with that of Ms. Sanders and Ms. Cortez. Additionally, given the documented time the tractor-trailer stopped and the time frame within which Ms. Smith claimed to have entered I-12 and then encountered the stalled traffic and the police officer standing outside his unit, it was virtually impossible for her vehicle to have been following the tractor-trailer while it was traveling on I-12.
We have carefully reviewed the evidence, particularly the maps, diagrams, and aerial photographs showing the location of Mead Road relative to "ground zero" and the geographic boundaries of the class. That review leads to the inescapable *121 conclusion that Ms. Smith also failed to prove that her friend's apartment in the Forestwood Apartments complex was within the class geographic boundaries and that she suffered any exposure to airborne BF3 sufficient to cause any symptoms at that location.[4] In its oral reasons for judgment, the trial court unambiguously determined that none of the five class representatives, Ms. Smith included, came into contact with any of the water used to mitigate the BF3 fumes, and that they did not suffer any chemical exposure in that manner.[5] Our review of the record leads us to the same conclusion. Thus, the issue of whether the apartment complex off Mead Road was adjacent to the flow of some of that water is irrelevant to Ms. Smith's claims for damages.
In support of the judgment in her favor, Ms. Smith in her brief claims that Dr. Mark Bayer, the defendants' expert toxicologist, could not "rule out" exposure to BF3 as the cause of her reported symptoms, and "offered no alternative plausible explanation for the symptoms." But we note that his testimony in that regard related to a hypothetical situation in which a motorist was following the leaking trailer as it travelled on the highway and experienced typical symptoms of such exposure. Ms. Smith presented no evidence that she was exposed in that manner, and as we have previously observed, the trial court's finding that she was "driving twelve cars behind the truck that was leaking" is unsupported by the preponderance of the evidence and clearly wrong.
A reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. Although a trial court's determination of credibility is entitled to deference on appellate review, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, a court of appeal may find manifest error even in a finding purportedly based upon a credibility determination. Toston v. Pardon, 03-1747, p. 12 (La.4/23/04), 874 So.2d 791, 800. In summary, this court cannot shirk its duty of appellate review of fact by simply deferring to a trial court's factual determinations because its reasons for judgment are couched in terms of a credibility call. Rogers v. City of Baton Rouge, 04-1001, p. 9 (La.App. 1st Cir.6/29/05), 916 So.2d 1099, 1104, writ denied, 05-2022 (La.2/3/06), 922 So.2d 1187. At some point, even a bare transcript may be so deficient in terms of quality of evidence that the trial court's error is manifest, even If some credibility determinations were necessarily made. Id. Such is the case here.
In certain circumstances, a plaintiff may recover damages for fear and *122 mental anguish sustained while a traumatic ordeal is in progress, regardless of whether the plaintiff sustained physical injury. Richardson v. American Cyanamid Co., 99-675, p. 18 (La.App. 5th Cir.2/29/00), 757 So.2d 135, 144, writ denied, 00-0921 (La.5/12/00), 761 So.2d 1291, citing Rivera v. United Gas Pipeline Co., 96-502, p. 14 (La.App. 5th Cir.6/30/97), 697 So.2d 327, 337. However, to recover for such mental anguish, an individual must show that he was involved in a hazardous situation, within the zone of danger, and that his fear was reasonable given the circumstances. Id. (Emphasis supplied.) More than minimal inconvenience and worry must be shown before damages may be awarded. McDonald v. Ill. Cent. Gulf R.R. Co., 546 So.2d 1287, 1292 (La.App. 1st Cir.1989).
There is only one reasonable view of the evidence on the issue of causation presented to the trial court related to Ms. Smith's claim, and that view is that Ms. Smith failed to meet her burden of proof at trial by a preponderance of the evidence. Thus, both the trial court's judgment denying the defendants' motion for involuntary dismissal and its judgment on the merits in favor of Ms. Smith were manifestly erroneous. We hereby reverse those judgments and dismiss Ms. Smith's cause of action. All costs of this appeal are assessed to the plaintiff-appellee, Janet Ayo Smith.
REVERSED.
NOTES
[1] In the stipulation of satisfaction of judgment executed by Ms. Smith's counsel, Ms. Smith expressly acknowledged that the defendants were "reserving all rights of appeal including any right to seek return from [Ms.] Smith any of the amounts paid of [sic] should said judgment be overturned upon appeal." See La. C.C. art. 2299.
[2] At trial, Ms. Smith claimed that her vehicle may have actually been "six to twelve" car lengths from the Sherwood Forest Boulevard exit at that time.
[3] The class definition limited membership of the class to "persons and entities who owned property, resided, worked or were located or were physically present within the geographical area specified herein" between 12:30 p.m. on August 2, 1999 and 6:00 a.m. on August 3, 199, and who claimed to have sustained damages as the result of the BF3 leak.
[4] Despite testimony from another witness, Debbie Morris, that her daughter's apartment in or near that complex was supposedly "about a thousand feet" from "the spill," such testimony was clearly non-probative of the location of Ms. Smith's friend's apartment.
[5] The trial court stated: "[Dr, Lowry, the plaintiffs' expert toxicologist] indicated that insofar as BF3 in its mixture with water, to suffer any type of effect, a person would have to come directly into contact with that water, and as I recall, there has been no evidence to indicate that anyone, or any of the five plaintiffs came into contact with any of the waste water that was running down the berm and ultimately through the canals and what have you."