GUIDRY, J.
|sRhodia Inc. (Rhodia), The Elliott Company (Elliott),[1] and Entergy Corporation (Entergy) appeal a class certification judgment in these consolidated suits arising from a chemical release at Rhodia’s Baton Rouge plant. For the reasons that follow, we affirm in part, reverse in part, and remand.
FACTS AND PROCEDURAL HISTORY
On February 22, 1999, the Rhodia plant in Baton Rouge lost electrical power due to a problem at an Entergy facility and released a small amount of sulphur trioxide from a stack. The release began at approximately 2:30 a.m. and lasted approximately forty minutes.
The East Baton Rouge Parish community alert system activated sirens near the Rhodia plant, alerting areas within a one-half-mile radius of each siren as follows:
This is an emergency alert message from the East Baton Rouge Communications District. There has been a toxic release type of incident at Rhodia. Residents in the area are advised to shelter in place, move indoors, close all doors and windows, shut off all air conditioning and heating systems, and please do not use your telephone unless a personal emergency. Tune in to your local radio and T.V. for more infoi’mation.
The community alert system also sent a recorded telephone message to telephones in the alert area, stating: “This is the East Baton Rouge Parish Communications District, there has been a toxic gas release at Rhodia. We will keep you updated as further information is received.” Once the release was controlled, the sirens were activated with an “all clear” message, and an “all clear” message was also sent to telephones in the alert area.
As a result of the release, four different groups of plaintiffs filed putative class actions against Rhodia, Entergy, and Elliott, beginning with the Stewart action | ¿filed on February 23, 1999, and followed by the Anderson, Jones, and Dixon actions, which were subsequently consolidated with the Stewart action.
The trial court held a hearing to determine class action certification on June 22, 2010. Thereafter, on September 21, 2010, the trial court signed a judgment certifying this matter as a class action and delineating three subclasses:
Subclass One: Persons who experienced some exposure to the released *487 chemicals in the plume or in the area of the plume.
Subclass Two: Persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of the chemicals.
Subclass Three: Persons who heard the sirens or loudspeakers, received a telephone call from the alert system or were contacted personally by Rhodia employees.
Rhodia, Elliott, and Entergy now appeal from the trial court’s judgment.
STANDARD OF REVIEW
A trial court’s decision to certify a class action is a two-step process. Therefore, appellate review of such decisions must also follow a two-step analysis. The trial court must first determine whether a factual basis exists for certifying the matter as a class action. These factual findings are subject to review by the appellate court pursuant to the manifest error standard. Singleton v. Northfield Insurance Company, 01-0447, p. 7 (La.App. 1st Cir.5/15/02), 826 So.2d 55, 60-61, writ denied, 02-1660 (La.9/30/02), 825 So.2d 1200. If the trial court finds that a factual basis exits for certifying the action, it then exercises its discretion in deciding whether to certify the class. This aspect of the judgment is reviewed pursuant to the abuse of discretion standard. Crooks v. LCS Corrections Services, Inc., 07-1901, p. 6 (La.App. 1st Cir.8/21/08), 994 So.2d 101, 108, writs denied, 08-2560, 08-2561 (La.1/9/09), 998 So.2d 725 and 726.
1 ^Unless a trial court committed manifest error in its factual findings or abused its discretion in deciding that class certification is appropriate, the appellate court must affirm the trial court’s determination. Crooks, 07-1901 at p. 6, 994 So.2d at 108. Further, in reviewing a trial court’s exercise of its discretion in certifying a class action, an appellate court should bear in mind the supreme court’s jurisprudential admonition to trial courts to err on the side of caution, in favor of maintaining the class action, because it is always subject to modification should later developments during the course of the trial so require. Boyd v. Allied Signal, Inc., 03-1840, p. 9 (La.App. 1st Cir.12/30/04), 898 So.2d 450, 456, writ denied, 05-0191 (La.4/1/05), 897 So.2d 606.
DISCUSSION
Louisiana Code of Civil Procedure article 591(A) sets forth the prerequisites for maintaining a class action and establishes that the use of the class action procedure is appropriate when:
1) The class is so numerous that joinder of all members is impracticable;
2) There are questions of law or fact common to the class;
3) The claims or defenses of the representative parties are typical of the claims or defenses of the class;
4) The representative parties will fairly and adequately protect the interests of the class; and
5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
All of the above elements must be present for an action to be properly certified as a class action. La. C.C.P. art. 591(B). The party seeking to maintain the class action bears the initial burden of prima facie proof of these elements. Boyd, 03-1840 at p. 10, 898 So.2d at 457. In determining whether these elements have been established, the court may consider the *488 pleadings, affidavits, depositions, briefs, exhibits, and testimony presented at a certification hearing. Singleton, 01-0447 at p. 9, 826 So.2d at 62; Boyd, 03-1840 at p. 11, 898 So.2d at 457.
Class action certification is purely procedural. Therefore, the issue at a class certification hearing is whether the class action is procedurally preferable, not whether any of the plaintiffs will be successful on the merits of their claims. Hampton v. Illinois Central Railroad Co., 98-0430, p. 6 (La.App. 1st Cir.4/1/99), 730 So.2d 1091, 1093. Further, the determination of whether there is a proper class does not depend on the existence of a cause of action; a suit may be a proper class action and still be dismissed for failure to state a cause of action. Hampton, 98-0430 at p. 6, 730 So.2d at 1093.

Objectivity and Numerosity

A class definition provides the framework against which the court can apply the statutory requirements in order to determine whether a class action may be maintained. Clement v. Occidental Chemical Corporation, 97-246, p. 9 (La.App. 5th Cir.9/17/97), 699 So.2d 1110, 1114, writ denied, 97-2884 (La.1/30/98), 709 So.2d 718. A class must be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case. Conrad v. Lamarque Ford, Inc., 08-673, p. 12 (La.App. 5th Cir.5/12/09), 13 So.3d 1154, 1162, writ denied, 09-1819 (La.11/6/09), 21 So.3d 310. The parties seeking certification must be able to establish a definable group of aggrieved persons based on objective criteria derived from the operative facts of the case. Conrad, 08-673 at p. 13, 13 So.3d at 1162. The requirement that there be a class capable of definition ensures that the proposed class is not amorphous, vague, or indeterminate. Clement, 97-246 at p. 9, 699 So.2d at 1114. Any subdivisions may be based upon 17geographical subgroupings, subgroupings by type of injury alleged, exposure, and other factors as may become apparent as a case management order is formulated, and the litigation progresses. Clement, 97-246 at p. 9, 699 So.2d at 1114.
In mass exposure tort cases, the determination of the issues of numer-osity and objectivity for class action certification is usually predicated upon proof of the geographic limits of potentially harmful exposure of the purported class. Boyd, 03-1840 at p. 12, 898 So.2d at 457-458. This court has previously recognized that “an integral part of the definition of the class to be certified is a determination of the geographic area of the class.” Hampton, 98-0430 at p. 7, 730 So.2d at 1094. Establishment of the geographic boundaries of a class action must be based on evidence in the record. Singleton, 01-0447 at p. 17, 826 So.2d at 66-67.
“Numerosity” requires that persons constituting the class are so numerous as to make joinder impracticable. This element is determined based upon the facts and circumstances of each individual case, and there is no set number above which a class is automatically considered so numerous as to make joinder impractical as a matter of law. Singleton, 01-0447 at p. 10, 826 So.2d at 62. Generally, a class action is appropriate whenever interested parties appear to be so numerous that separate suits would unduly burden the courts, and a class action would clearly be more useful and judicially expedient than the other available procedures. Crooks, 07-1901 at p. 7, 994 So.2d at 108.
In addition, this court has required that plaintiffs seeking certification *489 meet a threshold burden of plausibility as a component element of a prima facie showing of numerosity. Boyd, 03-1840 at p. 11, 898 So.2d at 457. The burden of plausibility requires some evidence of a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members. The prima facie showing need not rise to the level of proof by a preponderance of the evidence, as | swould be necessary to prevail on the merits. Boyd, 03-1840 at p. 12, 898 So.2d at 457.
At the class certification hearing in the instant case, two experts testified on behalf of the defendants. Dr. Paolo Zannet-ti, President of EnviroComp Consulting, Inc., was qualified as an expert in air pollution and air pollution modeling. Dr. Zannetti stated that as a result of a power outage to the Rhodia plant on February 22,1999, sulphur trioxide was released into the atmosphere, which, upon reacting with water vapor, produced sulphuric acid. This plume, according to Dr. Zannetti, subsequently traveled southwest due to winds coming from the North/Northeast. Based on a three-hour simulation, run every hour, Dr. Zannetti determined that the concentration levels within the plume ranged from 200 micrograms per cubic meter over a small area extending from the Rhodia plant over the Mississippi River to 10 to 20 micrograms per cubic meter over populated areas. Dr. Zannetti also ran a simulation using a thirty-minute interval, which had higher concentrations, but these concentrations were still well below the lowest level of concern for sul-phuric acid, which is 200 micrograms per cubic meter. Particularly, Dr. Zannetti determined that in populated areas, the concentration levels under both models were well below 200 micrograms per cubic meter.
Dr. Zannetti determined that based on the scientific laws of atmospheric diffusion and based on the models run, the contour lines of the plume are very clear in limiting the impact of the plume. Dr. Zannetti noted that there is always some uncertainty, between five to ten degrees, present in model results, but the basic result is that the plume had a limited cone of impact. According to Dr. Zannetti, it would be difficult for a person to smell any odor outside the contour of the plume, as the concentration level would have been lower than ten micrograms per cubic meter, and therefore, well below any odor threshold.
19Pr. Francis Weir, an expert in toxicology and industrial hygiene, also testified at the certification hearing. Dr. Weir concurred that the threshold level of concern is a concentration of 200 micrograms per cubic meter. Dr. Weir stated that according to the American Conference of Governmental Industrial Hygienists, a person can be exposed to 200 micrograms per cubic meter for eight hours and will not encounter a health deficit. Dr. Weir acknowledged that a person cannot smell pure sulfuric acid but can sense the presence of it, because it causes irritation, which the body interprets as though it were smelling it. However, this phenomena only occurs at a very high concentration level, ie., above 600 micrograms per cubic meter. Dr. Weir stated that a person exposed to 200 micrograms per cubic meter of sulfuric acid at ground level might sense the presence of some unusual, heavier than normal environment, but they would not have any irritation or smell from the material unless it were contaminated with some other product. Dr. Weir also stated that at a concentration of 20 micrograms per cubic meter at ground level, a person would not sense the presence of anything.
Dr. Weir stated that, based on the facts as presented, including the source of the *490 release and the wind direction, and if the models have any veracity, then there is no reason to believe that people upwind of the Rhodia plant should have experienced anything as a result of this particular release, and that certainly, they did not sense the presence of the sulfuric acid, physiologically, as a result of the release.
The plaintiffs did not offer any expert testimony at the certification hearing, but rather, admitted into evidence a forensic meteorology report prepared by Dr. David Mitchell. Dr. Mitchell specifically stated that the purpose of his study was to determine the impact of the plant emission on the surrounding neighborhoods downwind of the plant. The results of Dr. Mitchell’s report are similar to those contained in the models simulated by Dr. Zannetti. Dr. Mitchell’s report depicts the l^plume as having moved southwest from the Rhodia plant over the Mississippi River. In his first model using regulatory values, which are standard values for normal operating conditions provided by Rhodia to the Louisiana Department of Environmental Quality, Dr. Mitchell showed a concentration impact below the 200 microgram per cubic meter threshold level of concern. In a second model using non-regulatory values, or values different from the normal operating procedures, Dr. Mitchell showed a slightly higher concentration impact of 400 micrograms per cubic meter, in the same small area extending over the Mississippi River as represented in Dr. Zannetti’s model. However, in both models, Dr. Mitchell showed concentrations ranging from 10 to 20 micrograms per cubic meter in populated areas, which are well below the 200 micrograms per cubic meter threshold.
Dr. Mitchell’s opinion, after reviewing both his and Dr. Zannetti’s modeling results, is that “non-zero” ground level concentrations of sulfuric acid occurred as a result of the release, and that when these concentration level contours were plotted on top of the area map of the region downwind of the release the modeling results showed that large areas of Baton Rouge were exposed to and impacted by the sulfur trioxide emissions and resulting sulfuric acid vapor carried downwind of the emitting source. Dr. Mitchell did not further elaborate on or qualify “exposed to” or “impacted by.” Further, Dr. Mitchell noted in his report that the air dispersion models did not account for variations in wind speed and wind direction, which could occur during the hourly averaging period; however, he offered no evidence and rendered no opinion as to an impact of sulfuric acid emissions upwind of the Rho-dia plant.
Plaintiffs also introduced thousands of claimant information forms detailing, among other things, the individual claimants’ locations at the time of the release and Intheir alleged injuries.[2] Additionally, *491 several named plaintiffs testified at the certification hearing. Henry Stewart, Toni Thomas, and Benny Anderson testified that they heard an unintelligible noise come over the loudspeaker in the early morning hours of February 22,1999. Toni Thomas, Benny Anderson, and Betty Anderson stated that they also encountered a foul smell. Henry Stewart stated that when he went outside his home at 6:00 or 6:30 a.m., he had a burning sensation in his eyes. All plaintiffs stated that they were frightened by the alarm. Additionally, Sheila Jones, an unnamed plaintiff, testified that she received an automated phone call that something was going on at the Rhodia plant. Ms. Jones stated that she was frightened when she received the phone call, because she did not know what was going on and had never received a phone call like that before. She did not hear an alarm or encounter any smell.
119Erma Dixon, another named plaintiff, was working at Formosa Plastics on the morning of the release. She estimated that she was less than one mile from the Rhodia plant. She first heard about the release from her sister, who called her at approximately 3:00 a.m. She was bewildered, and when she went back outside, she encountered an unusual fog, which was a little bit irritating. She stated that she felt anxious because she did not know what was going on at the time.
Plaintiffs also introduced into evidence the deposition testimony of Joanne Mor-eau, the Director of the Louisiana Department of Homeland Security. Ms. Moreau said three community alert system sirens were activated on the morning of the release, with each siren having a one-half mile radius and rotating 360 degrees. In addition, the community alert system initiated an auto-dial telephone system. Ms. Moreau stated that the call area was determined by guidelines set forth in a federal emergency response guide, which identifies the radius based on off-site impact. According to phone logs attached to her deposition, approximately 1,700 homes in the community surrounding Rhodia were contacted on the morning of the release.
Finally, plaintiffs introduced the deposition of Jerry Kring, the plant manager at Rhodia’s Baton Rouge facility at the time of the release. Mr. Kring acknowledged that Rhodia employees went out into nearby neighborhoods and distributed a letter to residents, notifying them of the release, informing them that air monitoring did not find anything that would cause a health concern, and stating that phone calls were made and sirens were activated strictly as a precautionary measure.
*492 In certifying the instant class action, the trial court delineated three subclasses: (1) persons who experienced some exposure to the released chemicals in the plume or in the area of the plume, (2) persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of the chemicals, and (3) |1spersons who heard the sirens or loudspeakers, received a telephone call from the alert system, or were contacted personally by Rho-dia employees. The trial court stated in its reasons for judgment that the parameters for these subclasses are those persons within the plume distribution, those within a one-half mile radius of the sirensAoud-speakers that were activated, and those who received phone calls from the emergency communication system or were contacted personally by Rhodia employees.
However, from our review of the record, we do not find that the evidence presented at the certification hearing supports the trial judge’s designation of subclasses consisting of: (1) persons who experienced some exposure to the released chemicals in the plume or in the area of the plume; and (2) persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of the chemicals. First, with regard to the subclass consisting of persons who experienced some exposure to the released chemicals in the plume or in the area of the plume, the record demonstrates that the plume had a limited cone of impact, moving southwest from the Rhodia plant and over the Mississippi River. Erma Dixon was the only plaintiff within the 200 microgram per cubic meter concentration threshold, and as the plume moved southwest over the Mississippi River, the concentrations dropped to 10 to 20 micrograms per cubic meter over populated areas. All experts who testified at the hearing agreed that the lowest level of concern for sulphuric acid is 200 micrograms per cubic meter, and that the impact to populated areas downwind of the release was well below the 200 micrograms per cubic meter threshold. Dr. Weir further stated that while a person exposed to high levels of sulphuric acid, above 600 mierograms per cubic meter, may sense the presence of it and interpret it as a smell, a person exposed to 200 micrograms per cubic meter may | Msense some unusual, heavier than normal environment, but they would not have any irritation or smell from the material unless it is contaminated. Finally, Dr. Weir stated that at 20 micrograms per cubic meter at ground level, a person would not sense the presence of anything.
Further, though plaintiffs introduced the report of Dr. Mitchell, his findings are largely consistent with those of Dr. Zan-netti and Dr. Weir, particularly with regard to the direction of the plume and the levels of concentration. Additionally, though Dr. Mitchell states that his results show large areas of Baton Rouge downwind of the emitting source were exposed to non-zero ground level concentrations of sulphuric acid, he offered no opinion or testimony as the effect of such concentration.
Therefore, given the unrefuted evidence that the lowest level of concern for sul-phuric acid is 200 micrograms per cubic meter, and that at most, only one plaintiff was actually exposed to this level of concentration, we find that plaintiffs failed to meet the threshold burden of plausibility and failed to provide sufficient evidence to establish a large, definable group of aggrieved persons. Accordingly, the trial court erred in defining a subclass to con *493 sist of persons exposed to the released chemicals in the plume or in the area of the plume.
Second, with regard to the subclass consisting of persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of the chemicals, the record demonstrates that three sirens and loudspeakers were activated on the morning of the release, all of which are located upwind from the Rhodia plant. According to Ms. Moreau, these sirens have a one-half mile radius and rotate 360 degrees. In addition to the sirens, an automated telephone system was activated, which called or attempted to call approximately 1,700 homes in the area of the |1BRhodia plant. However, the expert testimony is clear that the wind on the morning of the release was blowing from the North/Northeast, and was pushing the plume southwest, or downwind. According to Dr. Weir, the people upwind of the Rhodia plant should not have experienced anything as a result of this particular release, and they certainly did not sense the presence of the sulphuric acid as a result of the release. Further, though Dr. Mitchell states in his report that the air models do not account for variations in wind speed and wind direction, which occur during an hourly averaging period, Dr. Mitchell agreed that the plume moved in a southwest direction and specifically limited his findings to the impact of plant emissions on the surrounding neighborhoods downwind of the plant.
In its reasons for judgment, the trial court noted Dr. Mitchell’s statement about variations in wind direction and stated, despite the unrefuted scientific evidence of the direction of the plume:
[A]nybody who’s been in South Louisiana, particularly a baseball fan like me, knows that when you sit in Alex Box Stadium, the wind blows in one direction for a while, and then it swirls around and comes from another direction for a short time. So while there may be a predominant direction and speed for the wind, that is not a constant. So the fact that the plume went southwest doesn’t mean people to the East or Northeast might not have, at some point, had some sensation of the plume.
However, to the extent that Dr. Mitchell’s statement in his report can be interpreted to dispute Dr. Zannetti’s and Dr. Weir’s opinions regarding the direction of the emissions from the Rhodia plant, the trial court’s use of judicial notice to resolve the disputed issue of material fact is improper. See Elliott v. United States Fidelity and Guaranty Co., 568 So.2d 155, 158 (La.App. 2nd Cir.1990). Further, even if Dr. Mitchell’s report is taken to question the direction of the winds on the morning of the release, the opinions expressed by Dr. Mitchell in his report specifically are limited to emissions dotmmnd of the release site. Therefore, his |; (¡report cannot support the conclusion that individuals upwind of the release site experienced some odor or other sensation of the presence of the chemicals.
Accordingly, based on the expert testimony in the record regarding the direction of the plume, and the lack of evidence to causally relate the alleged physical symptoms of the class members to the incident, we find the trial court erred in defining a subclass to consist of persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of the chemicals.
Finally, we address the third subclass defined by the trial court: per *494 sons who heard the sirens or loudspeakers, received a telephone call from the alert system, or were contacted personally by Rhodia employees. These claims are for fear, anxiety and emotional distress, absent any physical injury. In Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081 (La.1990), the supreme court set forth the necessary elements to recover damages for negligently inflicted mental distress. Generally, a defendant will not be held liable for such damages under Louisiana law where its conduct was merely negligent and caused only mental or emotional disturbance unaccompanied by physical injury. Moresi, 567 So.2d at 1095-1096; see also Bonnette v. Conoco, Inc., 01-2767, p. 22 (La.1/28/03), 837 So.2d 1219, 1234. The supreme court has recognized deviations from this general rule in various situations; however, it has only done so in cases where there is an “especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.” Moresi, 567 So.2d at 1096; see also Bonnette, 01-2767 at p. 23, 837 So.2d at 1234.
As stated above, three community alert sirens were activated in the community adjacent to the Rhodia plant with a one-half mile radius and rotating 360 degrees. Additionally, the community alert system called approximately 1,700 117homes, as identified on the call list admitted into evidence, informing individuals of the release. Several named, plaintiffs testified that they heard the alarm and loudspeaker, or received the telephone call, which message stated:
This is an emergency alert message from the East Baton Rouge Communications District. There has been a toxic release type of incident at Rhodia. Residents in the area are advised to shelter in place, move indoors, close all doors and windows, shut off all air conditioning and heating systems, and please do not use your telephone unless a personal emergency. Tune in to your local radio and T.V. for more information.
Mr. Stewart, Ms. Thomas, and Mr. Anderson stated that they were awakened in the middle of the night by the alarm and the loudspeaker message and were frightened. Additionally, Ms. Jones testified that she was frightened when she received a telephone call with a similar message. Finally, thousands of claim forms were admitted into evidence, with individuals claiming to have been frightened or fearful as a result of hearing the sirens and loudspeakers or receiving a telephone call.
Additionally, the record demonstrates that Rhodia dispatched personnel to go door to door in the neighboring community to distribute a flyer, informing individuals of the release. Defendants provided the addresses of the homes visited by Rhodia employees in their, answer to interrogatories, which were also admitted into evidence.
The trial court noted that the content of the message was particularly important in finding that the plausibility component of the numerosity analysis was satisfied. The court noted, “when people are told that there’s been a toxic release, they’re not to go outside, they’re to turn off their air conditioning and heating units so that nothing from outside comes in, they’re not to use the telephones, it’s certainly plausible that they would experience fear and anxiety.”
We are mindful that it is not necessary at the certification stage of the proceedings to prove the facts of the underlying cause of action, nor is it necessary |1sto prove that a cause of action exists. See Display South, Inc. v. Express Computer Supply, Inc., 06-1137, p. 7 (La.App. 1st Cir.5/4/07), 961 So.2d 451, 455; Hampton, *495 98-0430 at p. 6, 730 So.2d at 1093. Rather, the plaintiffs must establish a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members. Boyd, 03-1840 at p. 12, 898 So.2d at 457. This burden, however, is not fairly comparable to the burden of proof of causation, medical or otherwise, on the merits. Boyd, 03-1840 at p. 22, 898 So.2d at 463. Accordingly, from our review of the record, given the content of the message and the testimony and/or sworn statements of thousands of plaintiffs that they heard the message and were frightened or fearful, we find no error in the trial court’s determination that the plaintiffs met their burden of establishing a causal link between the incident and the injuries or damages claimed by sufficiently numerous class members.
Further, we find no error in the trial court’s definition of this subclass, as the testimony at the hearing geographically defined the area of the three sirens as having a one-half mile radius for each siren, rotating 360 degrees. Additionally, a phone log was admitted into evidence listing the numbers called by the automated system and the interrogatories listed the addresses visited by Rhodia employees. Accordingly, we find no error in the trial court’s determination that the plaintiffs established a definable group of aggrieved persons so numerous that joinder of their claims would be impracticable.

Typicality

In order for a class action to be maintained, the claims of the class representatives must be typical of the claims of the absent class members. La. C.C.P. art. 591(A)(3). Simply stated, this element requires that the claims of the class representatives must be a cross-section of, or typical of, the claims of all class members. Singleton, 01-0447 at p. 12, 826 So.2d at 63. Typicality is satisfied if|19the claims of the class representatives arise out of the same event, practice, or course of conduct giving rise to the claims of other class members and are based on legal theory. Boyd, 03-1840 at p. 25, 898 So.2d at 464-465.
In the instant case, the claims and alleged injuries of the class representatives and the absent class members for emotional distress arise from the same event and are based on the same legal theory. All of the plaintiffs will have to demonstrate that the release of sulphuric acid occurred, and that the release caused them emotional distress. Considering the claims of the plaintiffs and the record before us, we find no manifest error in the trial court’s finding that the element of typicality has been satisfied.

Adequate Representation

The parties seeking to maintain a class action must also demonstrate that the representative parties will fairly and adequately protect the interests of the class. La. C.C.P. art. 591(A)(4). The test for determining adequate representation consists of three elements: (1) the chosen class representatives cannot have antagonistic or conflicting claims with other members of the class; (2) the named representatives must have a sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiffs must be competent, experienced, qualified and generally able to conduct the proposed litigation vigorously. Boyd, 03-1840 at p. 26, 898 So.2d at 465; Singleton, 01-0447 at p. 13, 826 So.2d at 64.
From our review of the record, we find no evidence that the named plaintiffs have antagonistic or conflicting claims with other members of the class. Additionally, the record demonstrates that they have a sufficient interest in the outcome to ensure vigorous advocacy. Plaintiffs instituted *496 their actions in 1999, and they appeared in court at the certification hearing over ten years later and offered their testimony. Further, there is no evidence that plaintiffs’ counsel is not |ancompetent, experienced or unqualified. Therefore, we find no error in the trial court’s determination regarding adequate representation.
CONCLUSION
For the foregoing reasons, we affirm the trial court’s judgment certifying the class action. However, we reverse that portion of the trial court’s judgment delineating three subclasses, finding that the evidence did not support subclass one, consisting of persons who experienced some exposure to the released chemicals in the plume or in the area of the plume, or subclass two, consisting of persons who heard the warnings through the sirens, loudspeakers, or received a telephone call from the alert system and experienced some odor or other sensation of the presence of chemicals. We remand this matter to the trial court for issuance of a new judgment certifying the class action in conformity with the views expressed in this opinion. All costs of this appeal are assessed equally among the parties.
WHIPPLE, J., dissents & assigns reasons.
McDONALD, j., dissents.

. The Elliott Company was formerly known as Elliott Turbomachinery Company, Inc.

. The defendants contend on appeal that the trial court erred in admitting these claim forms at the certification hearing, because they were inadmissible hearsay. Louisiana Code of Evidence article 1101(A)(1) provides that "the provisions of this Code shall be applicable to the determination of questions of fact in all contradictory judicial proceedings and in proceedings to confirm a default judgment." However, La. C.E. art. 1101(B) provides, in pertinent part:
[I]n the following proceedings, the principles underlying this Code shall serve as guides to the admissibility of evidence [and t]he specific exclusionary rules and other provisions ... shall be applied only to the extent that they tend to promote the purposes of the proceedings....
(8) Hearings on motions and other summary proceedings involving questions of fact not dispositive of or central to the disposition of the case on the merits, or to the dismissal of the case, excluding in criminal cases hearings on motions to suppress evidence and hearings to determine mental capacity to proceed.
*491 As set forth in La. C.C.P. art. 592, the proponent of the class "shall file a motion to certify the action as a class action” and that “[n]o motion to certify an action as a class action shall be granted prior to a hearing on the motion.” As stated above, the purpose of the class certification hearing is not to determine whether the plaintiffs will be successful on the merits of their claims, but to determine whether the class action is procedurally preferable. Hampton, 98-0430 at p. 6, 730 So.2d at 1093. Therefore, the signed and notarized forms efficiently demonstrate the damages that each individual plaintiff is claiming, and have been recognized as an acceptable practice by this court. See Crooks, 07-1901 at pp. 7-8, 994 So.2d at 109-111; see also Boyd, 03-1840 at p. 11 and 22-23, 898 So.2d at 457 and 463; Singleton, 01-0447 at p. 9, 826 So.2d at 62; Ellis v. Georgia-Pacific Corp., 550 So.2d 1310, 1313-1314 (La.App. 1st Cir.1989), writ denied, 559 So.2d 121 (La.1990). Further, as noted by the trial court in granting the plaintiffs’ motion in limine, the court only allowed those forms that were signed and notarized to be admitted into evidence, and such admission was only for the purpose of the class certification hearing. Accordingly, we find that the purposes of the proceedings were best served by allowing the admission of these forms, and we find no error in the trial court’s determination.